**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONALD BARTON, JR.
155 Potomac Passage
Unit #335
Oxon Hill, MD 20745

Plaintiff,

v.

THE UNITED STATES OF AMERICA

*Serve on:*

Merrick Garland or His Designee
For Receipt of Service of Process
and Summons
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

And
Paul C. Ney, Jr., General Counsel
U.S. Department of Defense
1400 Defense Boulevard
Washington, DC 20301

And
Channing D. Phillips, Acting
U.S. Attorney for the
District of Columbia
c/o Civil Division
501 3rd Street NW, Fourth Floor
Washington, DC 20530

And
*Via certified mail to*:
Civil Process Clerk
United States Attorney's Office
555 Fourth Street, NW
Washington, DC 20530

Defendant.

Case No.: 1:21-cv-01367

COMPLAINT

**COMPLAINT**
**For Declaratory and Injunctive Relief and Monetary Damages**
**Employment Discrimination – Race**

Plaintiff Donald Barton files this Complaint against the United States Government Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.* ("Title VII") and 42 U.S.C. § 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law.
2. Venue lies in this judicial district pursuant to 28 U.S.C. §§ 2000e-5(f), 1391(a)(1), (a)(2), because this is where Plaintiff is employed by Defendants and where the discriminatory conduct alleged in this Complaint took place.

**PARTIES**

3. Plaintiff is a resident of the State of Maryland and is a civilian employee of the United States Department of Defense ("DOD"). Plaintiff has worked for a division within the DOD since 2004. At all times relevant to this Complaint, Plaintiff has been assigned to Bolling Air Force Base. Plaintiff is a man of African American descent.
4. The United States Department of Defense is an agency of the United States Government which has employed the Plaintiff since 2004. Plaintiff's Division, which is not specifically identified herein, falls under the authority of the DOD.
5. Defendant is subject to the anti-discrimination provisions of Title VII and 42 U.S.C. § 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991.

## EXHAUSTION OF PRE-FILING ADMINISTRATIVE PROCEDURE

6. Plaintiff timely submitted to the appropriate EEO office within the DOD a formal complaint based on the discriminatory treatment and retaliation set forth below. Plaintiff now timely files the instant lawsuit after receiving an adverse Final Agency Decision on February 19, 2021.

## FACTS

7. Plaintiff began working for Defendant at the DOD in 2004 where he is still presently employed.

8. Throughout Plaintiff's employment, Defendant promised him that he would be treated fairly—that he would not be harassed, that he would not be discriminated or retaliated against because of his race, and that any Human Resources-related investigation would be fair and impartial.

9. Defendant represented that it would not treat Plaintiff arbitrarily, that it would conduct investigations of alleged performance issues fairly and impartially, and that it would follow the recommendations of such completed investigations. These policies were stated verbally and are contained in Defendant's Personnel Manual and related statutes.

10. Defendant never disciplined Plaintiff in any way prior to its discriminatory and retaliatory acts that are at the heart of this Complaint, taken solely on the basis of Mr. Barton's race.

11. Throughout his career at DOD, Plaintiff has been a valued, loyal, and hard-working employee who received various promotions and accolades.

12. At all relevant times hereto, Plaintiff was a dedicated and high-performing DOD permanent employee who reported to work on time and professionally carried out his duties.

13. From June 2015 to May 23, 2017, Plaintiff's first line supervisor was James Cordell, Branch Chief (Caucasian male). Mr. Cordell was deployed in May 2017 and did not supervise Plaintiff after May 23, 2017. Plaintiff's second line supervisor during that time frame was Laura Brooks, Division Chief (Caucasian female).

14. Despite Mr. Cordell's deployment, he was the rating official for Plaintiff's final fiscal year 2017 (FY2017) performance appraisal and the reviewing official was Ms. Brooks.

15. As a result of Mr. Cordell's deployment, Brian Anderson became Plaintiff's first line supervisor from May 24, 2017 through the end of FY17. Mr. Anderson continued as Plaintiff's first line supervisor after FY17. Even though he supervised Plaintiff for almost half of FY17, Mr. Anderson did not participate in Plaintiff's FY17 performance appraisal.

16. Plaintiff's position within the DOD requires him to handle classified information. Prior to his final performance evaluation completed by Mr. Cordell in October of 2017, Plaintiff enjoyed good performance appraisals which would not have prohibited him from obtaining deployments—a valuable and lucrative benefit at DOD.

17. On or about April 13, 2017, Plaintiff met with Mr. Cordell and received his FY17 mid-year progress review. In the review, Mr. Cordell noted that Plaintiff was "ahead of schedule" completing his required tasks and that Plaintiff continued to "serve with distinction." Mr. Cordell then received a deployment and did not supervise Plaintiff after May 23, 2017.

18. On or about November 13, 2017, Plaintiff received his FY17 final performance appraisal from Mr. Cordell. After reviewing the appraisal, Plaintiff did not agree with the score of

2.9 or some of the language Mr. Cordell used to describe Plaintiff's performance, which differed greatly from the language Cordell used in the midterm review.

19. For example, Mr. Cordell "call[ed] into question Donald's personal accountability . . ." in the review and described Plaintiff as having "questionable work efficiency, task urgency, and time management . . .." Mr. Cordell also wrote that Plaintiff needed additional training to address "skill shortfalls" and that he lacked the drive to "be more a [*sic*] proactive, proficient performer . . .."

20. Plaintiff was shocked and blindsided by the FY17 performance appraisal since he (1) received a positive midyear review absent any of the derogatory language that appeared in the final appraisal, and (2) Mr. Cordell did not supervise Plaintiff after the midyear review and had no knowledge or information relating to Plaintiff's performance once Plaintiff came under the supervision of Mr. Anderson.

21. Moreover, Mr. Anderson never discussed with Plaintiff any of the performance deficiencies that Mr. Cordell included in Plaintiff's FY17 performance appraisal. In fact, Mr. Anderson told Plaintiff, in writing, that Mr. Cordell never reached out to Mr. Anderson regarding Plaintiff's FY17 performance appraisal.

22. Plaintiff did not sign the appraisal but, instead, reached out to Nicole White, Employee Management Relations (EMR) Specialist (African American female), about going through the process to grieve the FY17 appraisal.

23. Plaintiff wanted to grieve the performance appraisal not only because it was inaccurate, but also because the appraisal was likely to prevent Plaintiff from receiving a deployment and enjoying the career advancement and monetary benefits of deployment.

24. In preparing his grievance, Plaintiff was told that DOD policy requires that "[w]hen a permanent rater goes out on a deployment a temporary rater is assigned for the duration of the permanent rater's deployment." Accordingly, Mr. Anderson—and not Mr. Cordell—was the appropriate official to conduct Plaintiff's final FY17 performance appraisal.

25. In November of 2017, Plaintiff officially grieved his FY17 performance appraisal. Despite the clear violation of DOD policy and the fact that Mr. Cordell was in no position to appraise Plaintiff's performance after May 23, 2017, Laura Brooks, William Timmerman (Caucasian male), and Kecia Arnold (Caucasian female) all denied his grievances and appeals between November of 2017 and March of 2018.

26. According to the DOD deployment process, employees were required to report to the deployment office to review the available deployments. The deployment office then requests the employee's most recent performance appraisals before placing the interested employee on the deployment list and contacting the employee's home office within DOD. This is the process Mr. Barton followed when he successfully applied for and secured deployments before 2018.

27. In early 2018, during the time Plaintiff grieved his performance appraisal and in accordance with DOD policy, Plaintiff went to the deployment office to initiate the deployment application process like he did in years past.

28. This time, however, Mr. Barton was denied a deployment opportunity.

29. Plaintiff spoke with Mary Hennigan (now retired), a deployment manager. Upon Ms. Hennigan's request, Mr. Barton provided information related to his most recent performance appraisal. Ms. Hennigan told Plaintiff that, due to his FY17 performance

appraisal, he would not be able to secure a deployment, and that he needed to wait for his next appraisal before he would be considered for a deployment.

30. After his grievance and all appeals were exhausted without success, Plaintiff issued a complaint to the Inspector General's Office and requested their assistance. Plaintiff learned from the Inspector General's Office that his Division leadership retroactively changed his rating chain for the May 24, 2017–January 31, 2018 period from James Cordell to Brian Anderson after he filed his grievance. No one in Plaintiff's Division had ever mentioned this to Plaintiff.

31. After filing his complaint with the Inspector General's Office, Plaintiff's Division determined that Plaintiff was entitled to a rating "close-out" from Mr. Cordell for the period ending on May 23, 2017, and a close-out appraisal from Mr. Anderson for the May 24, 2017–January 31, 2018 period.

32. Effectively, Plaintiff would receive two appraisals, one based on his performance for the period ending on May 23, 2017 and one from May 24, 2017 through January 31, 2018. Each one would be based on Plaintiff's performance during the periods identified.

33. Because Mr. Anderson had already been reassigned by that time, Ms. Brooks took it upon herself to act as Mr. Anderson's proxy and, upon information and belief, prepared the written portion for the second half of the FY17 performance appraisal.

34. Plaintiff met with Mr. Anderson for the FY17 performance appraisal close-out meeting related to the dates Mr. Anderson supervised Plaintiff. The language and score that Mr. Cordell had originally included in Plaintiff's disputed performance appraisal had not changed and remained the same.

35. Plaintiff disputed that the Division had carried out its own directive to have his FY17 performance appraisal split, with Cordell completing the first half of the year and Mr. Anderson completing the second half of the FY17 appraisal. Instead, the language and scores remained the same while only Mr. Anderson's signature was added.

36. Maria Workman, Human Resources Performance Management Specialist (African American female), agreed with Plaintiff and emailed the following to Sean McHugh, Staff Officer (Caucasian male), Ms. Brooks, Donald Johnson, Staff Officer (Caucasian male), and Ms. White: "The language in the performance appraisal covering the period of 10/01/2016-05/23/2017 should only speak to performance that is specific to the first half of the performance cycle not the entire performance cycle. If the language speaks to the entire cycle, then [the agency] is required to provide the correct language/write up to OHR to insert on [the agency's] behalf on the back end of the system."

37. Ms. White also advised Plaintiff's leadership that "since [Plaintiff] now has two separate evaluations, the narrative comments in each should only reflect performance during each of the respective time periods."

38. Plaintiff's Division, through Ms. Brooks and Mr. McHugh, refused to change the language in the appraisal that Mr. Cordell initially placed in the disputed appraisal, which Mr. Cordell had no authority to issue in the first place.

39. Ultimately, Division leadership ignored the positive language Mr. Cordell initially used to evaluate Plaintiff when Cordell conducted Plaintiff's midyear review, and instead substituted the derogatory language as Mr. Cordell's final close-out appraisal for the first half (Cordell's portion of the FY17 appraisal) and the second half (Anderson's portion of

the FY17 appraisal) of Plaintiff's performance, frustrating the instructions provided by agency Human Resources representatives.

40. Plaintiff then contacted Ms. Arnold asking her to instruct his leadership to carry out the instructions of the agency Human Resources representatives. Ms. Arnold responded that Division leadership would not alter his FY17 performance appraisal.

41. Mr. Cordell, Ms. Brooks, Mr. McHugh, Mr. Timmerman, and Ms. Arnold refused to carry out the directives of the Human Resources Department in retaliation for Plaintiff's complaints to the Human Resources Department and the Inspector General's Office about his Division's failure to properly carry out his performance appraisal.

42. Mr. Cordell, Ms. Brooks, Mr. McHugh, Mr. Timmerman, and Ms. Arnold had actual knowledge that the FY17 performance appraisal would render Plaintiff ineligible for deployment. Alternatively, Mr. Cordell, Ms. Brooks, Mr. McHugh, Mr. Timmerman, and Ms. Arnold should have known that the FY17 performance appraisal would render Plaintiff ineligible for deployment.

43. Plaintiff's Division within the DOD has a history of discriminating against African American employees utilizing the performance appraisal process. Plaintiff is aware of at least three other African American employees who have been marginalized using this performance appraisal process.

44. Specifically, in 2016, Christina Elder (African American female) filed an EEO complaint against Mr. Cordell based on race and gender for a denial of a promotion and hostile treatment. Ms. Elder complained that Mr. Cordell misrepresented and mischaracterized her work performance to deny her a promotion. Additionally, Mr. Cordell, in an email to multiple employees, stated that Ms. Elder "lack[ed] task urgency"—the same criticism he

leveled against Plaintiff in his final FY17 evaluation. Apparently, this is Mr. Cordell's code for a "lazy" employee.

45. Ms. Elder believes that she received said discriminatory treatment from Mr. Cordell because of her race. She also believes that leadership in Plaintiff's Division treated other African Americans similarly regarding work performance matters for the same reason.

46. Likewise, Jasen Tanner (African American male) endured the same treatment when leadership in Plaintiff's Division failed to rectify an erroneous performance appraisal Mr. Tanner had received, containing an incorrect rating and derogatory language. Upon information and belief, Ms. Brooks and Ms. Arnold were also involved in the decisions to deny relief to Mr. Tanner and his attempts to grieve or otherwise correct the evaluation were equally unsuccessful.

47. Mr. Tanner is aware of African American employees having this specific issue within the Division; however, he is unaware of any Caucasian employees experiencing the same adverse actions at the hands of Division leadership.

48. Mr. Tanner believes that the treatment he received from Ms. Arnold and Ms. Brooks occurred because he is African American. He also believes that the treatment other African Americans received from Division leadership as it related to performance appraisals occurred because they, too, were African American.

49. Ms. Tosha Taylor (African American female) personally witnessed the favorable treatment white employees received in the Plaintiff's Division when it came to performance issues and when it came to correcting what white employees perceived as erroneous negative performance actions.

50. Ms. Taylor was on a temporary detail to Plaintiff's Division within DOD and supervised a white female civilian employee while she was there.

51. Ms. Taylor had to write the employee up for not following instructions to "report in" every morning for accountability purposes. The employee disagreed with the daily reporting process. One day, she approached Ms. Taylor at her desk and proceeded to yell at Ms. Taylor in a threatening manner and at a very high pitch, complaining about the "report in" requirement. As a result of the unprofessional actions and gestures of the employee, Ms. Taylor filed a Letter of Reprimand, which should have become a part of the employee's OHR file for three years.

52. Yet Mr. Timmerman, who was the acting Deputy Director of the Plaintiff's Division at the time, immediately asked Ms. Taylor to remove the Letter of Reprimand from the employee's OHR record.

53. Mr. Timmerman neither required any further counseling for the employee, nor did he require that the employee acknowledge any improper behavior. Ms. Taylor recommended that she and Mr. Timmerman speak to the employee regarding the unprofessional behavior and the importance of accountability before removing the Letter of Reprimand, however, Ms. Taylor's leadership did not agree to do so. Instead, Ms. Taylor's leadership made several attempts to remove the Letter of Reprimand without Ms. Taylor's knowledge. Subsequently, Ms. Taylor was removed from Plaintiff's Division and asked to return to her division prematurely, before her temporary duty assignment was completed.

54. During the time Ms. Taylor worked in Plaintiff's Division, she experienced discrimination by Ms. Brooks. Ms. Taylor also encountered other African-American

females that worked for Ms. Brooks that have experienced similar discriminatory treatment in which Ms. Brooks went out of her way to make negative remarks about them and gave them less than favorable performance appraisals.

55. In her last few months working in Plaintiff's Division, Ms. Taylor came under the direct supervision of Ms. Brooks. Since Ms. Brooks supervised Ms. Taylor for less than 90 days, however, she was not permitted to submit a performance appraisal for Ms. Taylor.

56. After Ms. Taylor returned to her own division, Ms. Brooks emailed and called her several times to force her to accept performance objectives created by Ms. Brooks, even though Ms. Taylor was no longer working under the supervision of Ms. Brooks.

57. Ms. Taylor did not accept the late performance objectives, citing (1) that she no longer worked in Ms. Brooks' division or for Ms. Brooks, and (2) that Ms. Brooks was not permitted to complete a performance appraisal when Ms. Taylor left the Division since she did not supervise Ms. Taylor for more than 90 days.

58. After Ms. Taylor refused to accept the performance objectives Ms. Brooks altered human resources records so that it would appear as though she supervised Ms. Taylor for more than 90 days.

59. Ms. Taylor contacted human resources upon learning of Ms. Brooks' actions and, after HR made several unsuccessful attempts to contact Mr. Timmerman, got the agency to correct the record of supervision.

60. To date, Ms. Brooks' performance objectives remain on Ms. Taylor's human resources page. It is Ms. Taylor's convicted belief that Ms. Brooks' attempts to alter human resources records so that she could rate Ms. Taylor's performance was an attempt to provide negative remarks and a less than successful rating on Ms. Taylor's performance

appraisal. Ms. Taylor has personal knowledge of other African Americans that Ms. Brooks treated in this manner.

61. Ms. Taylor believes that the treatment she received from Ms. Brooks was because she was African American. She also believes that the treatment other African Americans received from leadership in Plaintiff's Division as it related to performance appraisals occurred because they were African American.

62. Unfortunately, the discriminatory treatment Ms. Taylor was forced to endure at the hands of Ms. Brooks and other Caucasian employees in Plaintiff's Division within DOD was not unique; she encountered several other African American females who recounted similar experiences. Ms. Brooks apparently went out of her way to make negative remarks about them and gave them less than favorable performance appraisals, too.

63. The negative FY17 performance appraisal has had a substantial and lasting adverse effect on Plaintiff's career. For one, it is well-established that deployed employees receive additional pay and promotion potential, yet Plaintiff was unable to secure a deployment in 2018 due to his FY17 evaluation.

64. Prior to FY17, Plaintiff received two previous deployments, which helped him receive grade and step promotions at the agency. In addition to the promotion potential which accompanies deployments, employees receive a 35% nighttime bonus and a 35% hazard pay bonus for the length of the deployment.

65. During his prior two deployments, Plaintiff's biweekly check almost doubled compared to his regular salary. During deployment, Plaintiff could expect to work 8-12 hours every day of the week and weekends. Additionally, after Plaintiff's deployment, the agency granted his night differential pay of 35% and hazard pay which was an additional 35%.

66. Because of the discrimination he faced at the hands of agency officials, Plaintiff has been denied these valuable employment benefits.

67. Defendant denied these benefits to Plaintiff because of his African American race.

68. But for Plaintiff being African American, he would not have received a negative and untrue performance appraisal, and he would not have had to battle his agency to carry out the directives of their own Human Resources Department.

69. African American employees in Plaintiff's Division know, learn, and are taught by Division leadership that they will disproportionately receive poor or marginal performance appraisals which do not reflect their actual work performance. They also know, learn, and are taught that should they attempt to challenge the inaccurate appraisals, Division leadership will use pretextual excuses to refuse to correct appraisals to reflect their actual performance.

70. African American employees in Plaintiff's Division know, learn, and are taught by Division leadership that Caucasian employees will not receive discipline or marginal performance appraisals and, if they do, Division leadership will make every effort to correct it. Performance appraisals are key for employees in Plaintiff's Division to take advantage of the valuable benefit of deployments.

71. African American employees in Plaintiff's Division who are disproportionately and negatively impacted by poor or marginal performance appraisals form a racially identifiable group, department, and/or job.

72. Race is the only distinguishing feature between those employees who enjoy the support and assistance of leadership in Plaintiff's Division related to discipline and performance

and those employees who are denied such assistance and the valuable benefits connected thereto.

73. The aforementioned supervisors and managers responsible for mischaracterizing Plaintiff's performance and undeservedly assigning low evaluation marks to him do not treat Plaintiff's Caucasian colleagues as harshly or unfairly.

74. The discrimination faced by the Plaintiff and other African American employees as described above is a result of both overt discrimination by managers and supervisors in Plaintiff's Division who demonstrate discriminatory intent by their actions and communications with Plaintiff and other African American employees, and implicit bias by the same individuals who demonstrate discriminatory intent by favoring Caucasian employees over African American employees.

75. Had Plaintiff been White, he would have received an objectively fair and positive evaluation (or at least fairer and more positive), and his application for deployment in 2018 would have been successful. This would have placed Mr. Barton in a stronger position for future deployment and promotion opportunities.

**COUNT I**
**Discrimination Based On Race**
**In Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. §§ 2000(e), *et seq*.**

76. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

77. Plaintiff is a member of protected classes because he is African American.

78. Plaintiff was the victim of unlawful discriminatory conduct at the hands of the managers and supervisors in Plaintiff's Division, as described above.

79. Plaintiff was unlawfully subjected to disparate treatment on the basis of his race, and Defendant's proffered reason for Plaintiff's treatment was not the actual reason for these adverse employment actions but rather pretext to discrimination in violation of Title VII.

80. There is no legitimate non-discriminatory reason for the treatment Plaintiff and other African American employees received at the hands of the Defendant, as described above.

81. In taking the foregoing actions, Defendant denied, restricted, and abridged Plaintiff's terms, conditions, and privileges of employment; materially and adversely affected Plaintiff's current and future employment opportunities, and inhibited Plaintiff's ability to earn additional wages and other benefits.

82. In taking the foregoing actions and discriminating against Plaintiff on account of his race, including denying Plaintiff a deployment opportunity due to a discriminatory evaluation, Defendant violated the antidiscrimination provisions of Title VII.

83. Defendant's violation of Plaintiff's rights under Title VII caused him to suffer past and future pecuniary loss, loss of employment opportunities, loss of pension and value of his pension, loss of 401(k) benefits, and continued loss of current and future employment opportunities, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff requests that this Court issue a judgment against Defendant for compensatory and punitive damages, injunctive relief, attorney's fees and court costs incurred in pursuing this matter.

**COUNT II**
**Race Discrimination in Violation of**
**42 U.S.C. § 1981, as amended**

84. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

85. Defendant's discrimination against Plaintiff is in violation of the rights of the Plaintiff afforded him by the Civil Rights Act 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

86. By engaging in the conduct described above, Defendant intentionally deprived the Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of his contractual employment relationship with Defendant, in violation of 42 U.S.C. § 1981.

87. As described above, Defendant denied Plaintiff a deployment opportunity due to a racially discriminatory evaluation.

88. Defendant's violation of Plaintiff's rights under Section 1981 caused him to suffer past and future pecuniary loss, loss of employment opportunities, loss of pension and value of his pension, loss of 401(k) benefits, and continued loss of current and future employment opportunities, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff requests that this Court issue a judgment against Defendant for compensatory and punitive damages, injunctive relief, attorney's fees and court costs incurred in pursuing this matter.

**JURY TRIAL PRAYER**

Plaintiff hereby demands a trial by jury on all such eligible claims.

Dated: May 18, 2021

Respectfully submitted,

*/s/ Darrell Chambers*
Darrell Chambers [980872]
Douglas S. Rosenbloom [1016235]

**CHAMBERS & ROSENBLOOM LLP**
8403 Colesville Road, Suite 1100
Silver Spring, MD 20910
(202) 638-2831
darrell@chambersrosenbloom.com
doug@chambersrosenbloom.com